**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 8:21-cr-00156-DLB-1** |
| | ) | |
| **LORENZO MICHAEL LAMBERT,** | ) | |
| *Defendant*. | ) | |

<u>**DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE**</u>

Lorenzo Lambert, by and through undersigned counsel, respectfully files this Motion to Suppress Tangible Evidence, pursuant to the Fourth Amendment of the United States Constitution. In support of this motion, counsel submit the following.

## BACKGROUND

Mr. Lambert is before this Court charged in a six (6) count indictment with: two (2) counts of felon in possession of a firearm, pursuant to 18 U.S.C. § 922(g)(1), two (2) counts of possession with intent to distribute various controlled substances, pursuant to 21 U.S.C. § 841(a)(1), and two (2) counts of possession of a firearm in furtherance of a drug trafficking crime, pursuant to 18 U.S.C. § 924(c). *See* ECF No. 3.

## STATEMENT OF FACTS

*Factual Overview*

Law enforcement took the following actions, in chronological order:

1.      On January 7, 2021, Prince George's County Police Department obtained and executed a search warrant for a parcel ("Parcel 1"), pursuant to a drug-dog's alert. *See* Exhibit A.

2.      On January 13, 2021, the Prince George's County Police Department obtained a court order authorizing the use of a pen register device, including and trap and trace device and

caller-identification/caller-dentification deluxe feature, for phone number 202-594-1257. *See* Exhibit H.

3.      On January 13, 2021, the Prince George's County Police Department obtained a court order for electronic device location information, including cell-site simulator data, for phone number 202-594-1257. *See id.*

4.      On January 26, 2021, Prince George's County Police Department obtained and executed a search warrant for a parcel ("Parcel 2"), pursuant to a drug-dog's alert. *See* Exhibit C.

5.      On January 26, 2021, Detective Kelly effectuated a traffic stop on Robert Fleming after observing Mr. Fleming retrieve a target parcel. *See* Exhibit G. With Mr. Fleming's consent, Detective Kelly opened the parcel, finding approximately fourteen (14) pounds of suspected marijuana. *See id.* During this interaction, Detective Kelly also seized a phone in Mr. Fleming's possession: Apple iPhone with IMEI #353890105856170. *See id.*

6.      On January 27, 2021, the Prince George's County Police Department obtained a search warrant for Apple iPhone with IMEI #353890105856170. *See id.*

7.      On March 2, 2021, Prince George's County Police Department obtained a warrant to install a Global Tracking Device on a 1998 blue four (4) door Audi with Virginia Registration UES9538 and vehicle identification number WA1EV74L68D033135 and to seize the data therefrom. *See* Exhibit K.

8.      On March 5, 2021, the Prince George's County Police Department obtained a court order authorizing the use of a pen register device, including and trap and trace device and caller-identification/caller-dentification deluxe feature, for phone number 202-594-1257. *See* Exhibit I.

9.     On March 5, 2021, the Prince George's County Police Department obtained a court order for electronic device location information, including cell-site simulator data, for phone number 202-594-1257. *See id.*

10.     During the morning of March 11, 2021, officers searched Mr. Lambert's purported effects and arrested Mr. Lambert after he fled from a vehicle on foot. *See* Exhibit B; Exhibit E.

11.     Later on that same, a search warrant was executed at 1421 Sutler Terrace, Oxon Hill, Maryland, the residence of the mother of Mr. Lambert's child. *See* Exhibit B.

12.     On March 14, 2021, an employee ("Employee 1") at the Comfort Inn at 6363 Oxon Hill Road, Oxon Hill, Maryland 20745, contacted the Prince George's County Police Department to provide a controlled dangerous substance complaint call for service after another employee ("Employee 2") collected items from Mr. Lambert's hotel room. *See* Exhibit J. Officer Billy Carter went to the Comfort Inn, where he spoke with Employee 1 and retrieved the items. *See id.*

### The Parcel Search Pursuant to Search Warrants

On January 7, 2021, Prince George's County Police Department obtained a search warrant for a parcel described as:

> One brown colored parcel with Federal Express Tracking Number "7823 2376 1730" affixed to it. The target parcel is addressed to Ilanie Presas, 6363 Oxon Hill Rd, Oxon Hill, MD 20745. The parcel has a return address of Bhavesh Patel, Postal Annex #94, 3045 S. Archibald Avenue Suite H, Ontario, CA 91761. The parcel is currently in the possession of the Prince George's County Police Department's Narcotic Enforcement Division in Prince George's County, Maryland.

Exhibit A.

In the affidavit in support of the search warrant, affiant Detective Terrel Brooks stated that on January 7, 2021, while conducting parcel interdiction efforts, Detective Kelly located the above-described parcel, which had "similar characteristics of parcels found in the past to contain controlled dangerous substances." *See id.* The affidavit provided that Detective Kelly and his

3

canine partner, Spike, "conducted a canine drug scan on the parcel" along with "other non-targeted parcels." *Id.* Spike "gave an alert followed by an indication on the targeted parcel for the odor of controlled dangerous substances by sitting and pointing with his nose." *Id.*

As a rationale for the place to be searched and the item to be seized, Detective Brooks provided that he knows "traffickers of controlled dangerous substances often ship controlled dangerous substances utilizing overnight companies such as United Parcel Service, Federal Express[,] and Express Mail." *Id.*

The search warrant was executed on January 7, 2021. *See id.* The search revealed several pounds of suspected marijuana. *See* Exhibit B. Despite the search warrant mandating that the government return the warrant within ten (10) days of the date of its execution, along with a verified inventory of the items seized, *see* Exhibit A, counsel have not been provided any signed search warrant return.

On January 26, 2021, Prince George's County Police Department obtained a search warrant for a parcel described as:

> One brown colored cardboard box with Federal Express Tracking Number 7830 1228 3940 affixed to it. The parcel is addressed to INARI MASON 5909 SHOSHONE DR OXON HILL MD 20745. The parcel has a return address of BHAVESH PATEL POSTAL ANNEX #94 3045 S. ARCHIBALD AVENUE SUITE H ONTARIO, CA 91761. The parcel is currently in the possession of the Metropolitan Area Drug Task Force in Prince George's County, Maryland.

Exhibit C.

In the affidavit in support of this search warrant, affiant Detective Cedric Mitchell stated that on January 26, 2021, while conducting parcel interdiction efforts, he located the above-described parcel, which had "similar characteristics of parcels found in the past to contain controlled dangerous substances." *See id.* The affidavit provided that Detective M. Murphy and his canine partner, Mia, "conducted a canine drug scan on the parcel," during which Mia "gave an

alert on the targeted parcel for the odor of controlled dangerous substances by displaying a passive sit alert next to the suspected parcel." *Id.*

As a rationale for the place to be searched and the item to be seized, Detective Mitchell provided that, based on his training and experience, traffickers of controlled dangerous substances often ship controlled dangerous substances utilizing overnight companies such as United Parcel Service, Federal Express[,] and Express Mail." *Id.*

The search warrant was executed on January 26, 2021. *See id.* Despite the search warrant mandating that the government return the warrant within ten (10) days of the date of its execution, along with a verified inventory of the items seized, the search warrant was not returned. *See id.*

### The Search of Mr. Lambert's Bag

During the early morning hours of March 11, 2021, a detective observed a 2008 blue four (4) door Audi with Virginia Registration #UES9538 sitting at Iverson Street and Southview Drive, Oxon Hill, Maryland, with an individual slumped over in the driver's seat. *See* Exhibit B. When officers arrived on the scene, they claimed that they observed a man, later identified as Mr. Lambert, who appeared to be unconscious, and a handgun with an extended magazine sitting on the passenger's seat of the vehicle. *See id.*

When Mr. Lambert awoke, he became fearful from his interaction with law enforcement and drove his car a short distance before crashing it and continuing to flee on foot. *See id.* While Mr. Lambert was fleeing, a law enforcement aviation unit claimed that it observed him throw a bag. *See id.* Eventually, Mr. Lambert was apprehended on the ground and handcuffed, *see* Exhibit D at 00:07:36, and a handgun magazine loaded with ammunition was found under Mr. Lambert's body. *See* Exhibit E at 00:18:49. Some distance away, Mr. Lambert's bag was located and searched, *see* Exhibit E at 00:21:11; inside the bag, officers found a Glock 19 (serial number

BGWD721), a bag with 19.5 grams of suspected cocaine base, 26.2 grams of suspected heroin, and cutting agents. *See* Exhibit B.

### *The Search of 1421 Sulter Terrace*

On March 11, 2021, after Mr. Lambert's arrest, a search warrant was executed at 1421 Sutler Terrace, Oxon Hill, Maryland. *See* Exhibit B.

In the affidavit in support of the search warrant, the affiant provided that, based on his training and experience, criminals commonly store more proceeds, as well as other weapons, weapon accessories, and other controlled dangerous substances at their residences. *See* Exhibit F. The affiant also mentioned that law enforcement had conducted surveillance numerous times, during which they observed Mr. Lambert coming and going from this location, leading detectives to believe that he may have been using this address to store illegal items. *See id.*

During the search, the following items were seized: a Masterpiece 9mm semi-automatic handgun (serial number B9797), a Kel-Tec 8mm semi-automatic rifle (serial number E7054), a Century Arms, Inc., semi-automatic rifle (serial number V2007PM007423), a We the People 1776 caliber revolver, a Smith and Wesson M&P Shield 9mm semi-automatic handgun (serial number HKV9765), a FN 57 5.7x28 handgun (serial number 386188109), a .45 caliber ACP without a serial number, twenty-two (22) baggies containing 9,080 grams of suspected marijuana, body armor, a miscellaneous magazine and ammunition, and a trace amount of phencyclidine. *See* Exhibit B.

Despite the search warrant mandating that the government return the warrant within ten (10) days of the date of its execution, along with a verified inventory of the items seized, the search warrant was not returned. *See* Exhibit F.

***Obtaining Information Relating to Electronic Communication Devices***

On January 13, 2021, the Prince George's County Police Department obtained a court order authorizing the use of a pen register device, including and trap and trace device and caller-identification/caller-dentification deluxe feature, for phone number 202-594-1257 for a duration of thirty (30) days after the issuance of the order. *See* Exhibit H.

On January 13, 2021, the Prince George's County Police Department obtained a court order for electronic device location information, including cell-site simulator data, for phone number 202-594-1257 for thirty (30) days after the issuance of the order. *See id.*

On March 5, 2021, the Prince George's County Police Department obtained a court order authorizing the use of a pen register device, including and trap and trace device and caller-identification/caller-dentification deluxe feature, for phone number 202-594-1257 for a duration of thirty (30) days after the issuance of the order. *See* Exhibit I.

On March 5, 2021, the Prince George's County Police Department obtained a court order for electronic device location information, including cell-site simulator data, for phone number 202-594-1257 for thirty (30) days after the issuance of the order. *See id.*

On January 27, 2021, the Prince George's County Police Department obtained a search warrant for an Apple iPhone with IMEI #353890105856170. *See* Exhibit G. The affidavit in support of the search warrant provides that on January 26, 2021, detectives received information from Metropolitan Area Drug Task Force ("MADTF") about a parcel they located that morning with characteristics similar to those Detective Kelly, the affiant, was investigating at the time; Detective Kelly submitted that this parcel contained approximately fourteen (14) pounds of suspected marijuana. *See id.* The affidavit provided that detectives were told another parcel with the same characteristics and delivery address of the parcel found earlier that day was scheduled for

delivery that afternoon. *See id.* Detectives established surveillance at the respective address and observed Robert Fleming retrieve the parcel from the address's porch and place it into his vehicle. *See id.* Eventually, detectives identified a traffic violation by Mr. Fleming and called a marked car to initiate a traffic stop; Detective Kelly was the responding officer. *See id.* Mr. Fleming was asked to exit his vehicle before he was detained and read his *Miranda* rights. *See id.* Mr. Fleming then verbally consented to the search of his car. *See id.* When Detective Kelly located the parcel inside the car and asked Mr. Fleming questions about the parcel, Mr. Fleming advised that the parcel did not belong to him and that someone named Tay told him to go to the location and pick up the parcel on his behalf. *See id.* Detective Kelly then opened the parcel, which contained approximately fourteen (14) pounds of suspected marijuana. *See id.* The affidavit stated that Mr. Fleming was in possession of the Apple iPhone at issue during this interaction and was recovered from Mr. Fleming by Detective Kelly. *See id.*

The search warrant provided that law enforcement must execute the warrant within fifteen (15) days of its issuance. *See id.* Further, the warrant required law enforcement to return the warrant to the Court within ten (10) days of its execution, along with a verified inventory of the items seized. *See id.* The government has not provided any documentation to show that the warrant was returned to the Court. *See id.*

***The Search of Mr. Lambert's Hotel Room***

On March 14, 2021, Officer Billy Carter responded to the Comfort Inn at 6363 Oxon Hill Road, Oxon Hill, Maryland 20745, in reference to a controlled dangerous substance complaint call for service. *See* Exhibit J. Upon Officer Carter's arrival, a hotel employee ("Employee 1") explained to Officer Carter that Mr. Lambert checked into Room 512 on March 8, 2021 and had not yet checked out, and when an employee ("Employee 2") went to clean out the room, she found

several items, including two (2) black vacuum sealed bags that Employee 2 suspected to contain

an illegal substance. *See id.* Instead of throwing the items away, Employee 2 placed all items into

a large clear bag and turned it in to another individual, who then turned it over to Officer Carter.

*See id.* "All parties on the scene were advised and provided case numbers." *Id.*

**The Installation of a Global Tracking Device and the Collection of Such Data**

On March 2, 2021, Prince George's County Police Department obtained a warrant to install

a Global Tracking Device on a 1998 blue four (4) door Audi with Virginia Registration UES9538

and vehicle identification number WA1EV74L68D033135 and to seize the data therefrom. *See*

Exhibit K.

Despite the search warrant mandating that the government return the warrant within ten

(10) days of the date of its execution, along with a verified inventory of the items seized, *see*

Exhibit A, counsel have not been provided any signed search warrant return.

## ARGUMENT[1]

The Fourth Amendment to the United States Constitution provides that every search or

seizure must be reasonable. *See* U.S. Const. amend. IV. Subject to a few "jealously and carefully

drawn" exceptions, searches or seizures are per se unreasonable when executed absent a warrant

based on probable cause and delineating with particularity the areas to be searches and the persons

or items to be seized. *Adams v. Williams*, 407 U.S. 143, 154 (1972). The government holds the

burden of proving by a preponderance of the evidence that there was a need to employ a respective

exception. *See id.* (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455 (1971)).

In seeking the issuance of a search warrant, the government must present an affidavit

containing facts sufficient to "provide the magistrate with a substantial basis for determining the

---

[1]     The facts set forth in the various warrants or orders and their accompanying applications and affidavits overlap significantly; accordingly, counsel incorporate all applicable arguments throughout the entirety of this filing.

existence of probable cause." *Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *see Doe v. Broderick*, 225 F.3d 440, 451 (4th Cir. 2000) (citation omitted).

Probable cause can be lacking where the affidavit in support of the warrant fails to establish a "direct connection," or nexus, between the place to be searched, the things to be seized, and the underlying criminal activity. *United States v. Ali*, 870 F. Supp. 2d 10, 37 (D.D.C. 2012); *see also Zurcher v. The Stanford Daily*, 436 U.S. 547, 557 n. 6 (1978) (citation omitted) (noting that valid warrants must be supported by "'substantial evidence[ ] that the items sought are in fact seizeable by virtue of being connected with criminal activity, and that the items will be found in the place to be searched'"); *Warden v. Hayden,* 387 U.S. 294, 307 (1967) ("There must, of course, be a nexus . . . between the item to be seized and criminal behavior."); *Broderick*, 225 F.3d at 451 (citation omitted) ("The officer's supporting affidavit must make it apparent . . . that there is some nexus between the items to be seized and the criminal activity being investigated."); *United States v. Crawford*, 943 F.3d 297, 308 (6th Cir. 2019) (citation omitted) ("[T]o find probable cause justifying a warrant, we require a 'nexus between the place to be searched and the evidence sought.'")[2]. The requirement of a "clear nexus" is "firmly embedded" in the Fourth Amendment's standard of probable cause. *In re Application of U.S. for an Ord. Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d 526, 562, 567 (D. Md. 2011) (citing *Dumbra v. United States*, 268 U.S. 435, 441 (1925)).

In what is known as the exclusionary rule, evidence obtained in violation of the Fourth Amendment may not be introduced at trial. *See Mapp v. Ohio*, 367 U.S. 643, 655 (1961); *Weeks*

---

[2]    The Sixth Circuit has provided that the general rule requiring a nexus between a person and a place "is refined when the place is a home and the evidence drugs"; in this context, a court "may infer" that drug traffickers use their homes to store drugs and otherwise further their drug trafficking, as "evidence is likely to be found where the dealers live." *Crawford*, 943 F.3d at 308 (citation omitted).

*v. United States*, 232 U.S. 382, 398 (1914). Additionally, any evidence obtained as a direct or indirect result of an illegal search or seizure constitutes fruit of the poisonous tree and must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).

There are limited exceptions to the exclusionary rule. For example, under the "good faith exception," a search conducted pursuant to a legally invalid search warrant is still constitutional for Fourth Amendment purposes so long as certain criteria are met. *United States v. Leon*, 468 U.S. 897, 920 (1984) (discussing the "good faith exception"). However, the "good faith exception" does not apply in instances such as where (a) an affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; (b) a magistrate issuing a warrant relied on information in an affidavit that the affiant knew was false or would have known was false except for the affiant's reckless disregard for the truth[3]; (c) a warrant is so facially deficient as to particularity that the executing officers could not reasonably presume it to be valid; or (d) the issuing magistrate wholly abandoned his detached and neutral judicial role. *Id.* at 923.

## I.   THE SEARCH OF MR. LAMBERT'S BAG VIOLATED THE FOURTH AMENDMENT[4]

In *Arizona v. Gant*, 556 U.S. 332, 343-44 (2009), the Supreme Court held that, incident to an arrest, an officer may search the passenger compartment of an automobile without a warrant if "the arrestee is unsecured and within reaching distance of the passenger compartment at the time

---

[3]   A number of circuit courts have held that material omissions are also challengeable. *See Franks v. Delaware*, 438 U.S. 154, 171-172 (1978); *United States v. Jacobs*, 986 F.2d 1231, 1234-35 (8th Cir. 1993); *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985). The fact that probable cause existed and could have been established in a truthful affidavit, but was not cited in the warrant, will not cure a *Franks* error. *See Baldwin v. Placer Cnty.*, 418 F.3d 966, 971 (9th Cir. 2005).

[4]   As a preliminary matter, Mr. Lambert did not abandon the backpack under the Fourth Amendment because he did not "clearly and unequivocally" disclaim ownership. *United States v. Ferebee*, 957 F.3d 406, 414, 417, 421 (4th Cir. 2020) (finding the defendant abandoned his backpack when he told an officer that the bag was not his and, at the same time, held the bag out to a group officers as if inviting them to take it); *see United States v. Jones*, No. CR ELH-22-0371, 2023 WL 4627284, at *15 (D. Md. July 18, 2023) (finding that the defendant did not abandon his bag where he was in close proximity to officers and was sat down in handcuffs).

of the search."[5] Recently, the Fourth Circuit extended the Supreme Court's holding in *Gant* beyond the automobile context to the search of a backpack. *See United States v. Gist-Davis*, No. 20-4035 (4th Cir. May 7, 2021). For a warrantless arrest to be lawful of an individual in a public place, the officer must have probable cause to arrest, or reasonable grounds to believe that a crime was committed and that the arrestee committed it, based on the totality of the circumstances. *See Beck v. Ohio*, 379 U.S. 89, 91 (1964).

The officer's warrantless search of Mr. Lambert's backpack was only permissible as a search incident to arrest if it was performed substantially contemporaneously with Mr. Lambert's arrest and if it was reasonable for the officer to believe that Mr. Lambert "could have accessed [the backpack] at the time of the search," *Gist-Davis*, No. 20-4035 (4th Cir. May 7, 2021) (quoting *Chimel v. California*, 395 U.S. 752, 344 (1969)); *id.* at 11 (affirmatively citing *United States v. Buster*, 26 F.3d 627 (4th Cir. 2022), where the Fourth Circuit held that there was no "justification for a protective frisk after [the suspect] had been separated from the bag and no longer had access to it"). Here, the search was not performed substantially contemporaneously with Mr. Lambert's arrest. Additionally, the justifications for the search incident to arrest exception were absent; in other words, it was not reasonable to believe that Mr. Lambert could have accessed the backpack at the time of the search. *Compare Buster*, 26 F.3d 627 (invalidating a search of a bag "recently

---

[5]     The justifications for the search incident to arrest exception are the confiscation of weapons that could potentially be used to resist arrest, escape custody, or endanger police officers' safety and the seizure of evidence to prevent its concealment or destruction. *See Chimel v. California*, 395 U.S. 752, 763 (1969). Where the justifications for the search incident to arrest exception are absent, the exception does not apply. *See Gant*, 556 U.S. at 343 (holding that officer safety justifies search of arrestee's car incident to arrest "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search"); *United States v. Wills*, 316 F. Supp. 3d 437, 449 (D.D.C. 2018) (concluding that the justifications are absent and therefore the exception did not apply where the defendant was handcuffed at the wrists with his arms behind his back and an officer searched the defendant's backpack that was strapped on the defendant's back); *United States v. Leo*, 792 F.3d 742, 751 (7th Cir. 2015); *United States v. Tejada*, 524 U.S. 809, 811-12 (7th Cir. 2008) (explaining in the context of search incident to arrest that it is "inconceivable" that the defendant who was handcuffed, face down on the floor, and surrounded by police officers could have opened entertainment center and unzipped a travel bag inside it to reach for weapon).

possessed by a person who was—by the time the bag was opened—handcuffed and face-down on the ground"), *with Gist-Davis*, No. 20-4035 ("Gist-Davis was not fully secured on the ground, and had not been separated from his bag, which the officer reasonably believed contained a firearm"). When officers searched his backpack (located several yards away), Mr. Lambert was surrounded by a multitude of armed officers, including at least one (1) K9 unit, was on the ground, and was handcuffed with his arms behind his back. *See, e.g.*, Exhibit D at 00:07:36; Exhibit E at 00:18:49, 00:21:11. Indeed, Mr. Lambert "would have had to engage in significant acrobatics in order to gain access to the contents of his backpack at the time it was searched." *Wills*, 316 F. Supp. 3d at 449 (citation omitted). Mr. Lambert could not have realistically accessed the items in his backpack several yards away. Accordingly, the items seized from Mr. Lambert's backpack and the fruits thereof must be suppressed.

## II.   THE SEARCH OF 1421 SULTER TERRACE VIOLATED THE FOURTH AMENDMENT

### A.  The Court Should Suppress the Evidence Seized from 1421 Sulter Terrace and the Fruits Thereof for Failure to Establish a Nexus.

The affiant failed to establish a "clear nexus" between Mr. Lambert and the residence, the criminal activity and the residence, and the criminal activity and Mr. Lambert. *In re Application of U.S. for an Ord. Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d at 567. The affiant relied on guesswork instead of the requisite "substantial evidence." *Zurcher*, 436 U.S. at 557 n. 6. The circumstances actually showed that Mr. Lambert did not have unfettered access to 1421 Sulter Terrace, given that Mr. Lambert was asleep in a car parked on the street instead of driving a few blocks to sleep at the residence. *See Franks*, 438 U.S. at 171-172; *Leon*, 468 U.S. at 923.

Moreover, while the affiant concludes that exchanges were with Mr. Lambert, *see* Exhibit F, the affiant had little if any information to establish that he was in fact speaking to Mr. Lambert,

*see   id.*   Exhibit   FF   (Detective   Bailey   referring   to   the   person   as   "M"   or "Male" in his notes about the communications). In fact, at no point during the conversations did Detective Bailey ask who was speaking to or did the other party provide a name.

### B.  The Reliability of the Informant Providing a Tip About Mr. Lambert is At Issue.

The issue of reliability of the information provided to law enforcement by the woman picking up the parcel, as well as the lack of clarity in whether the affiant is declaring that the woman told law enforcement that it was in fact Mr. Lambert who she was receiving the package on behalf of or if this was the affiant drawing this conclusion based on his belief, are at issue. *See* Exhibit F. Further reliability inquiries should be made by the Court.

Where a search or seizure is based on a tip from an informant, the reliability of the informant must be demonstrated. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983). More than mere conclusory statements and bald assertions about the reliability of a tipster are required. *See id.* at 239. Instead, the reliability of a tipster is evaluated under the totality of circumstances, including his "veracity" (i.e., credibility and reliability) and "basis of knowledge" (i.e., how the tipster came to know the information). *Id.* at 238. The government can demonstrate veracity by showing the tipster has always provided the police with accurate information in past dealings; the tipster has provided information that is against her penal interest; the police have corroborated details in the informant's tip; and the tipster provides substantial detail relating not just to easily observable facts, but to future actions of individuals not easily predicted. *See id.* at 245. Here, the tipster provided no such assurances of reliability.

14

### III.     THE SEARCH OF THE PARCELS VIOLATED THE FOURTH AMENDMENT

#### A.  The Court Should Suppress Any Evidence Seized and the Fruits Thereof Because Probable Cause Did Not Exist at the Time the Search Warrant was Obtained or Executed.

In *Florida v. Harris*, 568 U.S. 237, 248 (2013), the Supreme Court provided that, "where the dog's alert is the linchpin of the probable cause analysis, . . . the reliability of the dog to alert . . . is crucial to determining whether probable cause exists." In 2011, the Chicago Tribune published an article addressing the unreliability of drug-sniffing dogs, based on three (3) years of data for suburban police departments in the United States. *See* Dan Hinkel, et al., *Tribune Analysis: Drug-Sniffing Dogs in Traffic Stops Often Wrong*, CHICAGO TRIBUNE (Jan. 6, 2011), https://www.chicagotribune.com/news/ct-xpm-2011-01-06-ct-met-canine-officers-20110105-story.html [hereinafter Hinkel, et al., *Tribue Analysis*] ("[S]tate data show the dogs been wrong more often than they have been right about whether vehicles contain drugs or paraphernalia."). Some of the startling data in the article includes the finding that only twenty-seven (27) percent of alerts on Hispanic drivers led to the discovery of drugs or paraphernalia. *See id.* Other analyses further illuminate how the use of drug-sniffing dogs is based on a myth of a dog's infallibility. *See* Andrew E. Taslitz, *Does the Cold Nose Know—The Unscientific Myth of the Dog Scent Lineup*, 42 HASTINGS L.J. 15, 20-38 (1990). For instance, researchers found only a fifteen (15) percent accuracy rate in an experiment conducted at University of California, Davis, involving eighteen (18) certified police canines. *See* Lisa Lit, et al., *Handler beliefs affect scent detection dog outcomes* 14(3) ANIM COGN 387-94 (2011), https://doi.org/10.1007%2Fs10071-010-0373-2; David G. Savage, *Supreme Court to Revisit Use of Dogs as Basis for Drug Searches*, LA TIMES (Oct. 31, 2012), https://www.latimes.com/archives/la-xpm-2012-oct-31-la-na-court-dogs-20121031-story.html [hereinafter Savage, *Revisit Use of Dogs*].

The data from the various analyses show precisely why "the fact that [a] dog has been trained and certified is simply not enough to establish probable cause for a search" and why a court must "take into account the potential for false alerts, the potential for handler error, and the possibility of alerts to residual odors." *Harris v. State*, 71 So. 3d 756, 767 (Fla. 2011), *as revised on denial of reh'g* (Sept. 22, 2011), *rev'd sub nom. Fla. v. Harris*, 568 U.S. 237 (2013), *and opinion withdrawn*, 123 So. 3d 1144 (Fla. 2013); *see also Harris*, 568 U.S. at 247 ("And even assuming a dog is generally reliable, circumstances surrounding a particular alert may undermine the case for probable cause—if, say, the officer cued the dog (consciously or not), or if the team was working under unfamiliar conditions.").

The reliability of the canine alerts here is suspect. In both applications and affidavits in support of the parcel warrants, the affiants provide that the respective canine's alert "may also indicate items recently contaminated with, or associated with the odor of one [(1)] or more of the controlled dangerous substances." Exhibit A; Exhibit C. As the affiants acknowledge, there is uncertainty built into the nature of the results.

Mia and Spike's work and training histories, including information about accuracy rates in the field and during training, must be assessed in order to make a proper finding as to reliability.[6]

Regardless of the dogs' accuracy rates, the information describing the procedures for the canine drug scans at issue is insufficient to substantiate findings of probable cause. The procedure for Spike's scan was vaguely described; it lacked the detail necessary to enable a judicial officer to determine if the procedure was not unduly suggestive or was otherwise properly implemented. *See* Exhibit A. It also left unanswered questions such as whether Spike engaged in a passive sit

---

[6]    When undersigned counsel requested Spike and Mia's credentials and training records, the government provided that Detective Kelly stated, in short, that every dog makes some errors during their initial training, that every dog will have instances in the field where they alert on a car, storage unit, etc., that is found not to currently contain drugs, and that, to be certified, the respective dog needs to alert on all appropriate scents.

alert given that there were differences in the descriptions of his alert and a passive sit alert. *See id.* As for Mia's scan, the description was limited to the affiant's declaration that Mia alerted via passive sit; in contrast to Spike's description, Mia's description failed to include a statement as to whether the scan was conducted along with non-targeted parcels. *See* Exhibit C. Moreover, neither description provided other crucial information, such as whether the canines alerted immediately or whether the procedure implemented complied with office policies. *See id.*; Exhibit A. Given how crucial search procedure is to ensure accuracy and fairness for drug-dog sniff searches,[7] there is no way to determine whether these sniffs were viable.

Of further significance, neither affiant provided meaningful information as to why the parcels were suspect in the first instance or what characteristics were similar to other parcels found to contain controlled dangerous substances. Indeed, the only information the affiants provided that arguably informed such dialogue is that "traffickers of controlled dangerous substances often ship controlled dangerous substances utilizing overnight companies such as United Postal Service, Federal Express, and Express Mail." *Id.* Yet, even this information only moves the ball so far, as drug traffickers use all sorts of shipment methods. In fact, inconsistency in the form of shipment used by a trafficker is a strategy in and of itself.

**B. The Court Should Suppress the Evidence Seized during the Warrantless Search and the Fruits Thereof Because Law Enforcement Did Not Have Valid Consent from Mr. Fleming to Search the Parcel.**

In certain instances a warrantless search can be authorized by a third person who is not the target of the search. *See Trulock v. Freeh*, 275 F.3d 391, 407 (4th Cir. 2001). Under Supreme Court and Fourth Circuit precedent, in order for a third person to provide valid consent to a search and

---

[7]     *See, e.g.*, Hinkel, et al., *Tribune Analysis* ("Leading a dog around a car too many times or spending too long examining a vehicle, for example, can cause a dog to give a signal for drugs where there are none. . ."); Savage, *Revisit Use of Dogs* (citing Interview with Lawrence J. Myers, Professor at Auburn University) ("[The U.C. Davis study showed that] the handlers, not the dogs, may be responsible for some of the alerts. This is a major problem, and we've known it for a long time. The behavior of the handler affects the behavior of the animal. . .").

seizure of another's container, the third person's consent must be freely and voluntarily given[8] and the third person must have authority to give consent[9]. *See United States v. Block*, 590 F.2d 535, 539 (4th Cir. 1978) (citations omitted). It is well-settled that third person consent "cannot validate a warrantless search when the circumstances provide no basis for a reasonable belief that shared or exclusive authority to permit inspection exists in the third person from any source," *id.* at 540 (citing *Stoner v. California*, 376 U.S. 483, 489 (1964)), "when the circumstances manifest to the contrary that the absent target of the search retains an expectation of privacy in the place or object notwithstanding some appearance or claim of authority by the third person," *id.* (citing *Reeves v. Warden*, 346 F.2d 915 (4th Cir. 1965); *United States ex rel. Cabey v. Mazurkiewicz*, 431 F.2d 839 (3d Cir. 1970)), or "when the retained expectation of privacy is manifest in the circumstances and the third person actually disclaims any right of access," *id.* (citing *United States v. Wilson*, 536 F.2d 883 (9th Cir. 1976)). Moreover, law enforcement has an affirmative duty to inquire further as to a third person's authority to consent to a search if the surrounding circumstances make that person's authority questionable. *See Montville v. Lewis*, 87 F.3d 900, 903 (7th Cir. 1996).

While authority to consent to a search of a general area extends to most objects in plain view within the area, consent does not automatically extend to the interiors of every enclosed container within that area. *See id.* at 541; *see, e.g.*, *Freeh*, 275 F.3d at 403 (holding that one user of a computer did not have authority to consent to a search of the other user's password-protected files). Instead, each enclosed container "stands on its own for this purpose." *Id.* (citing cases); *see*

---

[8]     The Ninth Circuit considers five (5) factors when determining if consent was validly given: whether the individual was in custody, whether arresting officers had their guns drawn, whether *Miranda* warnings were given, whether the individual was notified that he had the right to refuse consent, and whether the individual had been told a search warrant could be obtained. *See United States v. Soriano*, 346 F.3d 963, 968-69 (9th Cir. 2003), *amended by* 361 F.3d 494, 503 (9th Cir. 2004).

[9]     A third person has authority to consent if he has common authority. *See Freeh*, 275 F.3d at 407 (citation omitted). As the Supreme Court has explained, common authority rests on "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* (citation omitted).

*United States v. Yengel*, No. 4:12-cr-11, 2012 WL 12906331, at *3-4 (E.D. Va. Apr. 4, 2012), *aff'd*, 711 F.3d 392 (4th Cir. 2013) (citations omitted) ("[T]he Fourth Circuit has made it clear that the third-party consenter must have 'common authority' over the specific . . . object to be searched, not just over the room in which the . . . object is located."). Accordingly, various courts have concluded that, even where a third person has authority to consent to the search of a vehicle, that third person does not necessarily have authority to consent to the search of a container in it, *see United States v. Paul*, No. CR-05-116-RHW, 2006 WL 8445527, at *4 (W.D. Wash. Mar. 14, 2006) (finding that the third person did not have authority to consent to the search of a duffle bag in the car), and that one's expectation of privacy in a container is reasonable even after it is placed in the vehicle of the third person, *see id.*

Mr. Fleming's consent was not freely and voluntarily given; he was detained and had just been read his *Miranda* rights. *See* Exhibit G. Moreover, Detective Kelly knew that Mr. Fleming did not have authority to consent to the search of the parcel. *See id.* Here, Mr. Fleming made clear to Detective Kelly that he was neither the owner of the parcel nor did he otherwise have authority to grant consent to search the parcel[10]; Mr. Fleming even provided the name of the individual he believed to own the parcel and the circumstances as to why he was temporarily in possession of it. *See id.* Nevertheless, Detective Kelly opened the parcel and searched its contents. *See id.*

---

[10]    As the above-cited cases demonstrate, Mr. Lambert had a reasonable expectation of privacy in the parcel. Additionally, it is of significance that there are laws prohibiting the opening of postage addressed to other individuals; society has clearly recognized an expectation of privacy in this context. Indeed, if this were not so, no one would ask their neighbors to hang onto their postage while out of town.

## IV.   OBTAINING INFORMATION RELATING TO ELECTRONIC COMMUNICATION DEVICES

### A. The Court Should Suppress All Location Data Obtained Without a Valid Warrant and the Fruits Thereof for Noncompliance with *Carpenter* and its Progeny.[11]

In *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018), the Supreme Court held that the government's acquisition of cell site records constitutes a search within the meaning of the Fourth Amendment and therefore requires a valid warrant.[12] In the same year as the *Carpenter* decision, the Fourth Circuit relied on *Carpenter* to conclude that a court order for cell site data does not comply with what the Fourth Amendment requires; instead, as articulated in *Carpenter*, cell site data must be sought through a valid warrant. *See United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018); *id.* ("Carpenter is obviously controlling going forward. . ."). In the wake of *Carpenter*, courts have also extended the warrant requirement to the use of cell site simulators. *See, e.g.*, *In re Use of a Cell-Site Simulator to Locate a Cellular Device Associated with One Cellular Tel. Pursuant to Rule 41*, 531 F. Supp. 3d 1, 5, 7 (D.D.C. 2021); *United States v. Ellis*, 270 F. Supp. 3d 1134, 1146 (N.D. Cal. 2017); *United States v. Lambis*, 197 F. Supp. 3d 606, 610 (S.D.N.Y. 2016). Here, the government obtained cellular location data through court orders, not valid warrants. *See* Exhibit H; Exhibit I. Accordingly, any information obtained pursuant to the court orders and the fruits thereof must be suppressed.

---

[11]     As a preliminary matter, even if the Court concludes the court orders complied with *Carpenter*, the orders and related applications remain invalid due to failure to meet probable cause and specificity requirements.

[12]     *Carpenter*, 138 S. Ct. at 2212, held that an order which permitted the government to compel the disclosure of certain telecommunications records when it "offers specific and articulable facts showing that there are reasonable grounds to believe" that the records sought "are relevant and material to an ongoing criminal investigation," 18 U.S.C. § 2703(d), is not a permissible mechanism for the government to access cell-site data, and before compelling a wireless carrier to turn over such information, the Fourth Amendment requires the government to get a search warrant.

### V.      THE SEARCH OF MR. LAMBERT'S HOTEL ROOM

A search and seizure by an otherwise private person can constitute a government action under the Fourth Amendment, even where the government did not compel the private person to engage in the search or seizure. *See Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 615 (1989). At least one (1) circuit has found a hotel employee's warrantless search of a hotel room to amount to a government action in violation of the Fourth Amendment. *See United States v. Reed*, 15 F.3d 928 (9th Cir. 1994). In making this finding, the *Reed* Court pointed, in part, to the hotel employee's intent to help police gather proof of narcotics trafficking, as he "called the police in order to let them know that he felt he had a room and a guest that was 'involved in activity they would want to be aware of,' and because he suspected [the defendant] was involved in drug activity." *Id.* at 931; *see also id.* at 932 (citation omitted) (acknowledging a recognized premise that a private carrier's interest in preventing criminal activity was not a legitimate independent motivation).

On March 14, 2021, Employee 1 and Employee 2 were acting as agents of the government. When Employee 2 entered Mr. Lambert's hotel room, instead of throwing Mr. Lambert's items away, she seized the items in order for them to be provided to law enforcement. *See* Exhibit J. The Comfort Inn called the Prince George's County Police Department to provide a controlled dangerous substance complaint call for service. *See id.* And, when Officer Carter arrived, Employee 1 provided him with the seized items and Mr. Lambert's booking information. *See id.* As in *Reed*, 15 F.3d at 931, Employee 1 and Employee 2's actions illustrate their intent to help police gather proof of narcotics trafficking. Because Employee 1 and Employee 2 were acting as agents of the government, their conduct constitutes government action and the seized items and the fruits thereof must be suppressed.

## VI.      ATTACHMENT OF A LOCATION-TRACKING DEVICE ON THE CAR

In *United States v. Jones*, 565 U.S. 400 (2012), the Supreme Court held that the government's installation of a Global-Positioning-System ("GPS") tracking device on a vehicle and its use of that device to monitor the vehicle's movements constitute a "search" within meaning of the Fourth Amendment. Accordingly, as relevant here, a valid warrant is required.

The warrant application fails to explain the level of ambiguity relating to the car's use, raising a *Franks* issue. *See Franks*, 438 U.S. at 171-172; *Leon*, 468 U.S. at 923. Specifically, at no point does the affiant mention that the car was not registered to Mr. Lambert; instead, the affiant tries to suggest that it is Mr. Lambert who law enforcement sees coming out of the "target address" of 1421 Sulter Terrace and getting into the Audi. Exhibit G. Additionally, the affiant fails to mention that the cellphone GPS data that the affiant attributes to Mr. Lambert at 1421 Sulter Terrace pertained to the phone law enforcement seized from Mr. Fleming on January 26, 2021. *See id.* Had the affiant provided such information, the magistrate judge would have been privy to the fact that there was not a sufficient nexus between the car and Mr. Lambert.

The warrant application also fails to establish a clear nexus, or illustrate any meaningful connection, between the vehicle and Mr. Lambert or between the vehicle and any criminal activity. Relatedly, because of what appears to be a consistent typo, both the warrant and the warrant application actually pertain to a 1998 Audi, instead of the 2008 Audi; accordingly, the warrant and warrant application lack specificity to ensure that the 2008 Audi is the vehicle that will ultimately be searched. *See* Exhibit K.

In light of the foregoing, information procured pursuant to the warrant and the fruits thereof should be suppressed.

## VII.    NONCOMPLIANCE WITH COURT ORDERS AND WARRANTS[13]

Federal Rule of Criminal Procedure 41 governs search and seizure warrants. Rule 41 sets forth certain requirements for the proper execution of a warrant, including the requirement for tracking device warrants that the warrant be returned to the magistrate judge designated in the warrant within ten (10) days after the use of the tracking device has ended, *see* Fed.R.Crim.P. 41(f)(2)(B), the requirement for other warrants to be promptly returned to the magistrate judge designated on the warrant, *see* Fed.R.Crim.P 41(e)(2)(A)(3), and the requirement that the officer executing the warrant provide a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property, *see* Fed.R.Crim.P 41(f)(1)(C).

This Court has previously explained that "the search warrant standard codified in the Federal Rules of Criminal Procedure is rooted in the Fourth Amendment[] and is intended to articulate and implement Fourth Amendment principles, not to expand or change the Fourth Amendment parameters." *In re Application of U.S. for an Ord. Authorizing Disclosure of Location Info. of a Specified Wireless Tel.*, 849 F. Supp. 2d at 565. In other words, this Court has recognized that "[s]ubstantively, Rule 41 mirrors, and in no way alters or expands, the Fourth Amendment" and that Rule 41 "is the codified expression of Fourth Amendment law." *Id.* at 566. Accordingly, as set forth in Rule 41(h), a remedy for a violation of Rule 41 is suppression of the evidence obtained and the fruits thereof. *See* Fed.R.Crim.P. 41(h) ("A defendant may move to suppress evidence in the court where the trial will occur, as Rule 12 provides."); *see, e.g.*, *United States v. Freitas*, 800 F.2d 1451, 1455-57 (9th Cir. 1986) (holding that "the suppression order of the district court was proper insofar as it rested upon the warrant's failure to comply with Rule 41 or the

---

[13]    Undersigned counsel are working with the government to determine if the government did in fact return the warrants and orders in accordance with the terms of their terms.

Fourth Amendment," where the warrant did not provide for notice pursuant to Rule 41(d)). *But see United States v. Johns*, 948 F.2d 599, 604 (9th Cir. 1991) (citations omitted) ("[V]iolations [of Rule 41] which do not arise to constitutional error [require suppression where] there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed or . . . [where] there is evidence of intentional and deliberate disregard of a provision of the rule.").

By 1961, the Fourth Amendment was incorporated by the states. *See Mapp v. Ohio*, 367 U.S. 643 (1961); s*ee also Aguilar v. Texas*, 378 U.S. 108 (1964). *But see Wolf v. Colorado*, 338 U.S. 25 (1949). Accordingly, the strictures of Rule 41, which mirrors and does not add to the Fourth Amendment's scope or application, also apply to the states. Alternatively, Maryland Criminal Procedure § 1-203, Maryland Code, the Maryland law governing the search and seizure warrants, is sufficiently analogous to where the violation of one (1) amounts to a violation of the other for purposes of this case. Moreover, although the Fourth Circuit has moved away from this approach in most respects, courts continue to hold that the violation of a state law can be the basis to suppress evidence in a federal case.[14] *See also*, *e.g.*, *United States v. Coleman*, 162 F.Supp.2d 582, 586-89 (N.D. Texas 2001) (suggesting that the Fifth Circuit should reconsider its precedent that state law violations do not warrant suppression in federal cases); *Ker*, 374 U.S. at 37 ("[T]he

---

[14]     The Fourth Amendment's aim is to deter law enforcement misconduct. *See United States v. Seerden*, 916 F.3d 360, 366 (4th Cir. 2019) (citing *United States v. Leon*, 468 U.S. 897, 909 (1984)) ("Indeed, the exclusionary rule is primarily proscriptive; it is designed to safeguard Fourth Amendment rights through its deterrent effect."). The fact that the Fourth Amendment has been incorporated by the states, demonstrates that this aim applies to all levels of law enforcement—whether state or federal. *See Ker v. California*, 374 U.S. 23, 37 (1963).
        Where evidence can be used in a prosecution when a state law is violated, "admission of unlawfully seized evidence undermines state law and encourages state illegalities," a concern that is "heightened given growing federalization of crimes traditionally legislated and prosecuted by the states." *Coleman*, 162 F.Supp.2d at 588-89 (citation omitted). Indeed, state law restraints are "effectively nullified when any state officer who has exceeded his or her authority can turn over drug evidence to an Assistant U.S. Attorney willing to take the case"; this result is "inconsistent with comity" and undermines the interests of federalism. *Coleman*, 162 F.Supp.2d at 587-89, 591 (citations omitted); *see also United States v. Henderson*, 721 F.2d 662, 665 (9th Cir. 1983) (suggesting in dicta that "federal courts should, in the interest of comity, defer to a state's more stringent exclusionary rule with respect to evidence secured without federal involvement").

lawfulness of these arrests by state officers for state offenses is to be determined by California law."); *Seerden*, 916 F.3d at 365-66 (asserting that military rules and procedures affect whether a military search satisfies the Fourth Amendment's reasonableness requirement; providing that federal courts consider the Military Rules of Evidence in evaluating the reasonableness of military searches under the Fourth Amendment; concluding that, when a military officer effectuates a military search that violates the Military Rules of Evidence in a way that impedes a service member's  specific expectations of privacy, "a violation of the Fourth Amendment can result"); *United States v. Butz*, 982 F.2d 1378, 1382 (9th Cir. 1993) (holding that evidence obtained in violation of a state pen register statute is inadmissible in a federal case; good faith exception to the exclusionary rule applicable). Such an approach is consistent with the fact that determinations based on expectation of privacy are based in part on state law and that the crafting of the Fourth Amendment relies on state common law, among other things. *See, e.g.*, *Atwater v. City of Lago Vista*, 532 U.S. 318, 339-45 (2001).

The Court should suppress the evidence seized and the fruits thereof for law enforcement's failure to comply with the January 7, 2021 search warrant, *see* Exhibit A; the January 26, 2021 search warrant, *see* Exhibit C; the January 27, 2021 warrant to search the Apple iPhone with IMEI #353890105856170, *see* Exhibit G; the January 13, 2021 order allowing law enforcement to collect location information for phone number 202-594-1257, *see* Exhibit H; the March 2, 2021 warrant to install a Global Tracking Device on the Audi, *see* Exhibit K; the March 5, 2021 order allowing law enforcement to collect location information for phone number 202-594-1257, *see* Exhibit I; and the March 11, 2021 warrant to search 1421 Sulter Terrace, *see* Exhibit F. As it relates to each of these search warrants, law enforcement failed to comply with their terms, as counsel assert that the government did not return them to the Court with a verified inventory list of the items seized

within ten (10) days of the dates they were executed. *See* Exhibit A; Exhibit C; Exhibit F; Exhibit G; Exhibit K. Because law enforcement violated the terms of these search warrants and orders, the evidence obtained and the fruits thereof must be suppressed. Alternatively, even if the Court believes such violations do not amount to violations of the Fourth Amendment, given the repetitive nature of the violations, this conduct can readily be deemed intentional and deliberate disregard for the rule. *See Johns*, 948 F.2d at 604.

## CONCLUSION

In light of the above, Lorenzo Lambert respectfully requests that the Court suppress the aforementioned tangible evidence.

Respectfully submitted,

_____/s/_____
David Benowitz, Bar No. 17672
Amy C. Collins, Bar No. 30447
Price Benowitz, LLP
409 7th Street, NW, Suite 200
Washington, D.C. 20004
O: (202) 417-6000
F: (202) 664-1331
David@PriceBenowitz.com
AmyC@PriceBenowitz.com

*Counsel for Lorenzo Lambert*

**EXHIBIT LIST**

| Exhibit Name | Description |
|---|---|
| Exhibit A | Exhibit A_21-1-7 Parcel Search Warrant |
| Exhibit B | Exhibit B_Statement of PC |
| Exhibit C | Exhibit C_21-1-26 Parcel Search Warrant |
| Exhibit D | Exhibit D_tga00217_20210311091735e0_20210311091705_01_000w |
| Exhibit E | Exhibit E_tia00778_20210311090720e0_20210311090650_01_000w |
| Exhibit F | Exhibit F_21-3-11 Lambert Residence |
| Exhibit FF | Exhibit FF_Detective Bailey's Notes |
| Exhibit G | Exhibit G_21-1-27 Fleming Cell Phone |
| Exhibit H | Exhibit H_21-1-13 Lambert Phone Order |
| Exhibit I | Exhibit I_21-3-5 Lambert Phone Ping - Ping phone order3_03-05-2021-100943 |
| Exhibit J | Exhibit J_r_Comfort Inn Incident Report |
| Exhibit K | Exhibit K_21-3-2 Audi Vehicle Tracker |

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of August 2023, I have served this Motion upon all parties in this matter through the CM/ECF system.

_____/s/_____
Amy C. Collins